UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


RACHEL ROBINSON,                    )
                                    )
        *Plaintiff,*                )
*v.*                                )        No. 1:08-cv-143
                                    )        *Edgar*
T-MOBILE and T-MOBILE, USA, INC.    )
                                    )
        *Defendant.*                )


## MEMORANDUM

This action comes before the court on the motion for summary judgment filed by

Defendant T-Mobile, USA, Inc. ("T-Mobile"). [Court Doc. No. 49]. Plaintiff Rachel Robinson

brings claims against her former employer, Defendant T-Mobile, for alleged violations of the

Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"). Plaintiff claims that T-Mobile

interfered with her rights pursuant to the FMLA and alleges that the company retaliated against

her for taking FMLA leave by discharging her. Plaintiff also brings a claim for violation of the

Tennessee Disability Act ("THA"), Tenn. Code Ann. §§ 8-50-103 *et seq.* T-Mobile moves for

summary judgment dismissal of all of Plaintiff's claims. [Court Doc. No. 49]. Plaintiff opposes

the motion for summary judgment. [Court Doc. No. 53]. The court has reviewed the record, the

arguments of the parties, and the relevant statutory provisions, regulations, and caselaw. Based

on this analysis, the court has determined that it will **DENY** the motion in part and **GRANT** the

motion in part.


## I.      Background

Viewing the events in the light most favorable to the Plaintiff, the court finds the following relevant facts. Plaintiff Robinson worked at T-Mobile from February 27, 2006 until February 27, 2008. [Court Doc. No. 1, Complaint, ¶ 5]. She began working in the position of Customer Service Representative ("CSR"). [Court Doc. Nos. 49-1, 53-1, Deposition of Rachel Robinson ("Robinson Dep."), p. 111]. Following a few months in that position, T-Mobile promoted Plaintiff to the position of Senior Representative. *Id.* at 111-12.

The record demonstrates that Plaintiff took FMLA leave sometime in early 2007 due to complications with her pregnancy. Robinson Dep., p. 116. Following her return from pregnancy leave, T-Mobile again promoted Ms. Robinson, this time to the position of Coach. *Id.* at 120. According to Plaintiff's manager, Steven Bechard, "Coaches are responsible for coaching, monitoring, leading, training and motivating" CSRs. [Court Doc. No. 49-4, Affidavit of Steven Bechard ("Bechard Aff."), ¶ 3]. Plaintiff began this position on August 26, 2007. *Id.* at 121. As Mr. Bechard explained in his affidavit:

> Following a coaching session, Coaches are required to prepare a report of the session and enter this information in Performance Management (PM). PM is an electronic database into which supervisors (including Coaches) enter references of verbal counselings, coachings, written disciplinary action, and the like. The purpose of the report is to make sure there is a record of what the CSR is doing well, what the CSR is doing poorly, and a way to make improvements on the things that the CSR is not doing well. If there is no report, there is no way for the Company to know whether a CSR's poor performance is the CSR's fault or the coach's fault.

Bechard Aff., ¶ 4.

In the position of Coach, Plaintiff was expected to provide "coachings" to CSRs on a weekly basis. *Id.* at 124. Plaintiff testified that "[t]hat's how it was supposed to be, but it was mandatory that a lot of those coachings were canceled due to call volume." *Id.* If a coaching

was canceled, Plaintiff understood that T-Mobile expected her to do an "ad hoc coaching" "if the time is available." *Id.* However, Plaintiff also indicated that "[i]t may be limited as to how quickly you can get that worked in" based on the time available and the call volume. *Id.* at 125. Plaintiff further understood that she was expected to create a written record summarizing her "coaching" sessions. *Id.* She testified that she had not been able to attend a "Coach University," a one week workshop of dedicated training for Coaches, due to her lack of time in the position. She also testified that although she met with her team manager regarding the expectations of her position, she:

> didn't get very much development from my team manager and he often canceled our one-on-ones. So, you know, I tried to seek out feedback to get further information on how to, you know, be productive at my job, but I was a little bit lost at exactly all of the ins and outs of being the coach.

*Id.* at 127-29. Plaintiff did understand that T-Mobile expected her to provide written feedback regarding her "coachings" within forty-eight hours. *Id.* at 139. CSRs were generally taken "off the clock" for their coachings. *Id.* at 141.

In early 2008, Plaintiff needed additional FMLA leave related to the care of her mother due to her mother's serious health condition. Robinson Dep., p. 141. Plaintiff's mother had a history of serious health problems, including two prior brain aneurysms, a brain tumor, and partial paralysis. *Id.* at 142. In January of 2008, Plaintiff's mother began slurring her words, and doctors located a mass in her brain. *Id.* at 143.

Plaintiff requested intermittent leave around January 4, 2008. *Id.* at 142, 145. Plaintiff's manager, Steven Bechard, granted Plaintiff's request for leave, telling her, "[y]ou just be here when you can and do what you can do." *Id.* at 145, 147. She agrees that she was on a "really friendly basis" with her manager at that time as long as she agreed to "do a lot of work,"

including working from the hospital and from home while caring for her mother. *Id.* She

indicated in her deposition that:

> I decided to take the intermittent leave because I talked to Steven and I told him
> my situation and he really identified with me and told me, you know, I understand
> where you're coming from, but it's going to be hard for me to do this on my own
> because we're short-staffed.
>
> And so I out of loyalty to the company decided that I would take intermittent
> leave so that I could try to balance both and still do my work and he promised to
> help me. . . . He said don't worry about your observations and your coachings so
> much this month. He's like I'm going to help you. Our whole core group is
> going to help you get that done. You just be here when you can and do what you
> can do and I agreed to take the intermittent leave.

*Id.* at 146-47; *see also,* pp. 206-07. Mr. Bechard encouraged Plaintiff to take only intermittent

leave due to her work responsibilities, and he questioned the severity of her mother's illness. *Id.*

at 206-07, 211. Plaintiff's intermittent leave ended on January 22, 2008. *Id.* at 149.

Plaintiff submitted an additional request for FMLA leave on February 12, 2008, and T-

Mobile granted her request for more leave so that she could help her mother at home following

her release from the Intensive Care Unit. *Id.* at 150, 152. Plaintiff sought a complete leave of

absence from February 13, 2008 until February 23, 2008, which T-Mobile approved. *Id.* at 149-

52. She returned to work on Sunday, February 24, 2008.

On the date that Plaintiff returned from leave, Plaintiff testified to the following initial

response from her manager, Mr. Bechard: "On the 24th we got there bright and early. It was a

new shift and we were there like 5:30 in the morning. And he was like hey, I'm glad to have you

back. This is going to be a great team. We're going to do real good." Robinson Dep., p. 155.

Then Plaintiff attended a team meeting with Mr. Bechard where he praised her coaching skills to

her entire new team, calling her a "great coach." *Id.* at 156. Following the team meeting, Mr.

-4-

Bechard informed Plaintiff that he was glad that "your mom is getting better and this leave is behind you." *Id.* at 156. Plaintiff described the following exchange between Mr. Bechard and her that transpired after the team meeting on February 24th:

> And I said, well, that's something I would like to talk to you about. I was like, you know, I thought my mom was going to be able to come home and be able to start getting better, but it doesn't look like that way. It looks like she's going to need more intensive care. And, as a matter of fact, I'm going to have to take additional FMLA. And I told him, I said, I hate to do this to you, especially with us getting a brand new team, but I have no other choice. I'm my mom's only caregiver. And, I mean, we went to a room together, and I was crying, I was upset, you know, about my mom.

> And he was like, well, Rachel, this is – this is when he completely changed as, you know, somebody I looked at as a peer and a friend. He, you know, told me there has to be a line where you choose your personal life against your professional life and this is it.

> And, you know, I said I don't know what to do because I have to take this leave. There's nobody else to care for my mom. . . . But on that conversation, it was on the 24th, he said, Rachel, you really need to decide between your personal and professional life. You've got to draw a line.

Robinson Dep., p. 156-57. During that conversation Mr. Bechard also mentioned that "it had been really hard on him while [Plaintiff] was out, that it was killing him to do two jobs." *Id.* at 203-04.

On February 25, 2008 Mr. Bechard began asking Plaintiff questions about her records of coachings during her intermittent leave period. Robinson Dep., p. 158. Plaintiff describes the exchange she had with Mr. Bechard during a meeting on the 25th:

> And so I went to meet with him and he said, Rachel – you know, it was a lot more formal. He completely changed tones. And he was like, Rachel, as you know, part of your job is to accurately document coachings and call monitors. He said and I'm looking through the records and I'm not showing that that's been done during January and February. He said during January and February it looks like your performance has declined.

-5-

And I said, well, Steven, you know that you told me you were going to help me
during January and February. You were going to help me do coachings, help me
document them, help me monitor my calls.

And he said, well, I need to know exactly what you did on this date, this date, and this date. And
I said, Steven, I haven't even gotten my laptop back yet from being on FMLA. I said I don't
know how I can come up with what I did on these times. And he said, well, you've got an hour
and you need to try to come up with what you can to the best of your knowledge.

So I went to another computer and logged into it and I looked into a system that
showed when people were logged off of the phones and by memory tried to the
best of my recollection to come up with exactly what was done during those
times.

And I went back in there in an hour and I met with him and I said, Steven, this is
what I have for you. I'm not sure if there's more or if all of this is absolutely
correct. I said if you give me more time, I get my laptop back, I can look into
their actions [sic] plans. I can tell you what was done. A lot of the times they
were pulled for floor support during those times while I was on FMLA, whether it
was in January and it was intermediate [sic] or while it was the continual.

And he said, well, I need you to write me a statement. And he said what I need to
do from you now is take your badge.

Robinson Dep., pp. 158-60. Following this conversation, Mr. Bechard escorted Ms. Robinson

out of the building. *Id.* at 160. Plaintiff was prepared to apply for an additional FMLA leave,

but Mr. Bechard confiscated her badge before she had the opportunity to do so. *Id.* at 215.

With respect to the written records of her coachings, Plaintiff asserts that she had written

documentation of such sessions in her laptop, but that Mr. Bechard would not permit her to

access the records saved on the hard drive in her laptop. *Id.* at 161, 165-68. Plaintiff claims that

Mr. Bechard took her laptop during her non-intermittent FMLA leave, telling her that "it was

company policy that during FMLA [she] couldn't have company property." *Id.* at 167. Plaintiff

asserts that in asking her to create written documentation of her coachings without access to her

laptop, Mr. Bechard "came to me in a split second and told me to do something that I really

-6-

didn't understand and gave me an hour to do it." *Id.* at 177.

Plaintiff returned to T-Mobile on the 26th of February to meet with Mr. Bechard. Robinson Dep., pp. 196-97. Plaintiff met with Dale Jones, T-Mobile's Human Resources Manager, and Mr. Bechard, and Mr. Jones provided Plaintiff with separation papers. *Id.* at 197; [Court Doc. No. 53-2, Deposition of Dale Jones ("Jones Dep."), p. 3]. Plaintiff questioned why she had received a "wonderful quarterly and yearly review." Robinson Dep., p. 197. She also asked why she did not receive a warning prior to the termination. *Id.* at 198. She was "confused about" the reasons for her termination and asked whether it had anything to do with her mother's illness. *Id.* Mr. Jones responded that it had "nothing to do with your mom being sick." Then Plaintiff left, and her termination was effective on February 27th. *Id.* Plaintiff's mother died on March 15, 2008. *Id.* at 70.

Mr. Jones testified that T-Mobile terminated Plaintiff for dishonesty related to reporting coachings that occurred but that never actually occurred. Jones Dep., p. 127, 128. Mr. Jones did not personally speak to any CSRs working under the Plaintiff, but he testified that he spoke to Mr. Bechard who had talked with those CSRs. *Id.* at 128. Mr. Jones understood that instead of conducting coachings, Plaintiff showed CSRs pictures at her desk and accompanied CSRs to get sodas, although he never saw anything in writing from the CSRs making those representations. *Id.* Mr. Jones described the reasons for Plaintiff's termination in the following way: "I mean, you look at everything, reason, record, circumstance. I mean, the big issue was the dishonesty, and the big issue was the, you know, I'm a leader and I'm telling you that I'm doing something, and I'm not telling you the truth." Jones Dep., p. 139. Mr. Jones never talked to Plaintiff directly about her version of the missing coaching records, nor did he investigate Plaintiff's

-7-

contention that she did not have her laptop after he was informed of such contention. *Id.* at 145-148. Mr. Jones further did not interview Plaintiff prior to the meeting at which he terminated her because he "felt like Steve had brought the information and it was valid, and that was a decision he recommended and I supported and the general manager supported." *Id.* at 148.

Mr. Jones verified that Plaintiff had previously won T-Mobile's "Peak Award" in 2007 which provided her with a trip to Hawaii. *Id.* at 151. The "Peak Award" was a subjective award given to "someone who is living the values above and beyond" meaning "going above and beyond" several core standard values of the company. *Id.* at 151-52. Only one employee per quarter received such an award. *Id.* The Peak Award was granted to "the top one percent of the company . . . for peak achievers." [Court Doc. Nos. 49-3, 53-3, Deposition of Steven Bechard ("Bechard Dep."), p. 16].

Mr. Bechard testified in his deposition that he initiated the meeting with Mr. Jones to discuss Plaintiff's employment at T-Mobile. Bechard Dep., p. 46. Mr. Bechard confirmed that he asked Plaintiff to pull together her written documentation of coachings within an hour. *Id.* at 18. When Plaintiff returned after the end of the hour, Mr. Bechard felt that her documentation was "[v]ery limited. It was on scrap pieces of paper. It would not quantify what took place in a coaching between her and a CSR, as well as it wasn't all there." *Id.* at 20. Mr. Bechard disputes Plaintiff's claim that she did not have access to her laptop. *Id.* at 21. He found that the dates of when he knew coachings should have occurred did not match the Plaintiff's supplied dates in her documentation. *Id.* at 32. Mr. Bechard also received an email message from one of his team members who had assisted with Plaintiff's job duties during her FMLA leave. The message indicated that the coachings the CSRs had received from Plaintiff were infrequent and were often

-8-

not very productive.  [Court Doc. No. 49-5].

Mr. Bechard then "shared his concern" with Mr. Jones that he believed Plaintiff was "dishonest."  *Id.* at 33.  He did not believe that he could draft a performance improvement plan ("PIP") "around dishonesty," so he recommended terminating Plaintiff.  *Id.* at 33-34.  The evidence on whether Plaintiff had received a PIP is unclear because Mr. Bechard also testified in his deposition that he did place Plaintiff on a PIP and fired her as part of that process.  *Id.* at 50.  The scheduled coachings at issue had occurred over a period between January and February of 2008.  *Id.* at 35.  Mr. Bechard spoke to CSRs on Plaintiff's team who indicated that Plaintiff had not provided them with coachings on occasion.  *Id.* at 39-40.  Mr. Bechard recommended to the regional general manager, Tim Krug, that T-Mobile terminate Plaintiff, and Mr. Krug agreed with Mr. Bechard's recommendation.  *Id.* at 42-44.

T-Mobile disputes Plaintiff's contention that she did not have access to her laptop to provide the written documentation of her coachings.  The company submits an affidavit of a T-Mobile Digital Forensics Analyst indicating that "the user identification that was assigned to Ms. Robinson logged onto the laptop computer assigned to Ms. Robinson on February 24, 2008 and February 25, 2008."  [Court Doc. Nos. 54-3, 57-1, Affidavit of Kimberly D. Simmers ("Simmers Affidavit"), ¶¶ 2, 5].  The computer login sheet indicates that Plaintiff's user identification was used to log into her T-Mobile computer at 4:04 on February 24th and again at 3:01 on February 25th. [Court Doc. No. 54-3].  The login sheet does not indicate whether the login times were A.M. or P.M., but the document appears to include other times listed in military time, such as 18:26.  *Id.*

## II.    Plaintiff's Motion to Strike

Plaintiff moves to strike the Simmers Affidavit on the grounds that Ms. Simmers was never identified as a potential witness in this action and that the computer login sheet is not properly authenticated and thus constitutes hearsay. [Court Doc. No. 55]. T-Mobile asserts that it did not need to identify Ms. Simmers as a witness because her testimony was being used for the purpose of impeachment. [Court Doc. No. 57]. It further argues that Ms. Simmers properly authenticates the document at issue pursuant to Fed. R. Evid. 901 and that it satisfies the business records exception in Fed. R. Evid. 803(6). *Id.* Plaintiff replies that T-Mobile's response is untimely and therefore, should not be considered by the court.

The court will consider T-Mobile's response and concludes that Ms. Simmers' affidavit does not violate Fed. R. Civ. P. 26(a)(3)(A) or Fed. R. Civ. P. 37(c)(1) because the affidavit is being offered to impeach Plaintiff's version of events regarding the use of her laptop. Further, this court concludes that Ms. Simmers' affidavit properly authenticates the document at issue pursuant to Fed. R. Evid. 901 and that the document constitutes a business record pursuant to Fed. R. Evid. 803(6). Therefore, the court will **DENY** Plaintiff's motion to strike.

### III. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

## IV.    Analysis

### A.    FMLA Claims

The FMLA provides eligible employees with up to "12 workweeks of leave during any 12-month period" for various reasons, including "to care for . . . a . . .parent, of the employee . . . if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). An employee eligible for leave under the FMLA is one who has "been employed –(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). In this case the parties appear to agree that Plaintiff was an eligible employee under the FMLA. Although Plaintiff had some leave due to complications related to pregnancy, T-Mobile does not argue that Plaintiff was not entitled to take FMLA leave to care for her mother in January and February of 2008.

The statute defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves–(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). As the Sixth Circuit has noted, "Congress enacted the FMLA because, among other reasons, 'there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'" *Cavin v. Honda of America Manuf. Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (quoting 29 U.S.C. § 2601(a)(4)). However, "'to invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave.'" *Id.* at 723 (quoting *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)).

The Act prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). Further, the FMLA provides that it is "unlawful for any employer to discharge or in

any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). An employee who believes her rights under the FMLA have been violated may file suit in federal court. 29 U.S.C. § 2617. An injured employee may receive damages and equitable relief for violation of 29 U.S.C. § 2615. 29 U.S.C. § 2617(a)(1).

The Department of Labor ("DOL") has promulgated numerous regulations intended to explain many of the entitlements and obligations under the FMLA. For instance, the regulations explain employee protections under the Act in relevant part:

> Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act . . . . "Interfering with" the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. . . .

29 C.F.R. § 825.220(b).

In this action Plaintiff claims that T-Mobile both interfered with her ability to take FMLA leave and terminated her in retaliation for asserting her rights under the FMLA. With respect to FMLA claims, the Sixth Circuit has rejected "an overly rigid approach which stands in conflict with our notice-pleading system." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 446 (6th Cir. 2007). In *Wysong* the Sixth Circuit noted that: "Although we analyze an FMLA claim based on the interference theory differently from one based on the retaliation theory, notice pleading does not box plaintiffs into one theory or the other at the complaint stage of an FMLA action." *Id.* Thus, this court will analyze both the interference claim and the retaliation theory.

**1.     FMLA Interference Claim**

The Sixth Circuit has held that "[t]o prevail on [an] interference claim under §

2615(a)(1), Plaintiff must establish that [defendant] interfered with a FMLA right to medical

leave or to reinstatement following FMLA leave." *Hoge v. Honda of America, Mfg., Inc.*, 384

F.3d 238, 244 (6th Cir. 2004). A plaintiff must demonstrate that:

> (1) she was an eligible employee, (2) [the defendant] is a covered employer, (3)
> she was entitled to leave under the FMLA, (4) she gave [the defendant] notice of
> her intent to take leave, and (5) [the defendant] denied her FMLA benefits or
> interfered with FMLA rights to which she was entitled.

*Id. See also, Cavin*, 346 F.3d at 719; *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir.

2005); *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

With respect to the first two requirements, the parties agree that Plaintiff was an eligible

employee under the FMLA and that T-Mobile is a covered employer. The parties also do not

appear to dispute that Plaintiff requested FMLA leave for a qualifying reason, the serious health

condition of her mother, and that she provided T-Mobile with adequate notice of the need to take

leave. The parties disagree on the final requirement that T-Mobile interfered with her right to

take FMLA leave.

The Sixth Circuit has explained the parameters of the interference theory of FMLA

violations:

> The "entitlement" or "interference" theory is derived from the FMLA's creation
> of substantive rights. If an employer interferes with the FMLA-created right to
> medical leave or to reinstatement following the leave, a violation has occurred.
>
> The issue is simply whether the employer provided its employee the entitlements
> set forth in the FMLA–for example, a twelve-week leave or reinstatement after
> taking a medical leave. Because the issue is the right to an entitlement, the
> employee is due the benefit if the statutory requirements are satisfied, regardless
> of the intent of the employer.
>
> The substantive right to reinstatement provided in § 2614(a)(1), however, "shall

> [not] be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). Similarly, the right to non-interference with medical leave is not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.

*Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998)) (other citations omitted). Once the employee provides sufficient notice of the need for leave, the burden shifts to the employer to obtain information regarding whether the leave is potentially FMLA-qualifying. *See e.g., Fritz v. Phillips Serv. Indust., Inc.*, 555 F.Supp.2d 820, 825 (E.D. Mich. 2008); *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999); *Sahadi v. Per Se Technologies*, 280 F.Supp.2d 689, 698 (E.D. Mich. 2003).

The Act prohibits an employer from "interfer[ing] with . . .the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). This includes "discouraging an employee from using such leave. . . ." 29 C.F.R. § 825.220(b). However, the Sixth Circuit has explained that:

> [a]n employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave. . . . It follows from this that "whether an employer violates the FMLA turns on why the employee was not reinstated." If the employee cannot show that he was discharged because he took leave – or at least that his taking of leave was a "negative factor" in the employer's decision to discharge him – he cannot show a violation of the FMLA.

*Pharakhone v. Nissan North America, Inc.*, 324 F.3d 405, 408 (6th Cir. 2003) (citing 29 U.S.C. § 2614(a)(3)(B); 29 C.F.R. § 825.216) (other citations omitted); *see also, Edgar v. JAC Products,*

*Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (noting that "[b]oth the statute and the DOL regulation likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct").

There are several different blocks of FMLA leave at issue in this case. Plaintiff's first FMLA leave, leave for complications relating to pregnancy is not at issue here. The parties do not argue that this initial leave by Plaintiff exhausted her entitlement to FMLA leave. The second leave is the intermittent leave that Plaintiff requested and received in early 2008.[1] Plaintiff asserts that although she desired to take a total leave of absence from work, her manager, Steve Bechard, encouraged her to take only intermittent leave due to the volume of work on his team. Robinson Dep., pp. 146-47; 206-07.

Plaintiff returned from this second FMLA leave sometime in February and requested additional leave from February 13th through the 23rd. T-Mobile again granted this request for leave, and Plaintiff apparently did not complete any work at this time. When she returned on February 24, 2008, Plaintiff informed Mr. Bechard that she would need additional FMLA leave associated with her mother's illness. Although it is unclear whether Mr. Bechard recalls this conversation, this court must view the facts in the light most favorable to the Plaintiff.

By providing notice of the potential need for leave, Plaintiff was attempting to exercise her rights pursuant to the FMLA. In addition, "[t]he right to actually take twelve weeks of leave

---

[1] The court has only vague indications of the precise dates of Plaintiff's various FMLA leaves that it has gleaned from the record because the parties have not supplied the court with any employment records providing a cogent summary of Plaintiff's various leaves and the amounts of time off associated with each leave.

-16-

pursuant to the FMLA includes the right to declare an intention to take such leave in the future."

*Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir. 2001) (citing 29 U.S.C. §

2612(e)).  In *Skrjanc* the Sixth Circuit noted, that the FMLA covers "the right to request twelve

weeks of leave pursuant to the FMLA without being fired in retaliation."  *Id.*

      To request a leave under the FMLA, an employee does not need to use the name of the

FMLA in her request for FMLA-qualifying leave.  *See Hoffman v. Professional Med Team*, 394

F.3d 414, 418 (6th Cir. 2005); 29 C.F.R. § 825.303(b).  The FMLA regulations prescribe what

kind of notice an employee must provide regarding the need for leave when the need for leave is

not foreseeable.

> (a)     When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case.  It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.  In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

> (b)     The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. . . . The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.  The employer will be expected to obtain any additional required information through informal means.  The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

29 C.F.R. § 825.303(a)-(b).

      Courts in this circuit have determined that for example, where a "plaintiff informed her

employer that she could not come to work because her minor daughter was sick and, after she

-17-

returned to work, reiterated to her employer that her child had been sick, the plaintiff gave her employer sufficient notice that her unforeseeable leave potentially qualified under the FMLA." *See Bryant v. Delbar Products, Inc.*, 18 F.Supp.2d 799, 805 (M.D. Tenn. 1998) (citing *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp. 1028 (M.D. Tenn. 1995)). In *Bryant* the court granted summary judgment in favor of the FMLA plaintiff on the issue of liability. 18 F.Supp.2d at 807. The court found that the employer violated the FMLA by assessing the plaintiff with a negative employment penalty for her absence when it had notice that the absence was an FMLA-qualified leave. *Id.* The court noted:

> . . . [plaintiff] informed [her employer] that her son was sick by telling [her employer] that he had been hospitalized. In contrast to the plaintiff in *Satterfield*, [plaintiff] communicated directly with [her employer] on the day she needed time off, rather than waiting twelve days, and provided [her employer] with concrete, not "meager," information as to why she needed time off. In addition, unlike the plaintiff in *Reich*, [plaintiff] made it clear to [her employer] that her son was receiving inpatient care and gave [her employer] notice the day after her son was hospitalized.

> Thus, [plaintiff] provided [her employer] with adequate notice that she was requesting unforeseeable leave in a potentially FMLA-qualifying situation. At that time, the burden shifted to [her employer] to "obtain any additional required information through informal means." 29 C.F.R. § 825.303(b).

*Bryant*, 18 F.Supp.2d at 806 (citing *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973 (5th Cir. 1998)).

In this action Plaintiff claims that Mr. Bechard discouraged her from taking the first FMLA leave associated with caring for her mother by pressuring her to take only intermittent leave at that time. *See* Robinson Dep., p. 146-46; 206-07. In addition, Plaintiff also claims that she informed Mr. Bechard on February 24th of her need for additional FMLA leave to care for her mother. *Id.* at 156-57. It was only after she informed Mr. Bechard of the need for additional

-18-

leave that his "tone" changed completely. *Id.* at 158. It was also after she informed him of her need for leave that he told her to choose between her personal and her professional life. *Id.* at 156-57. The next day, February 25th, was the day Mr. Bechard requested documentation of Plaintiff's coachings in January and February to be provided within an hour. *Id.* at 158-60. The parties dispute whether Plaintiff had access to her laptop at that time, but the court must view the facts in the light most favorable to the Plaintiff on summary judgment. In addition, although the affidavit of Ms. Simmers provides evidentiary support for T-Mobile's contentions, it is not clear that someone else did not use Plaintiff's user identification to log into her laptop on February 24th and February 25th. The times of login are unclear, but may have been in the very early morning, and the court is unsure of when Plaintiff worked on those days. There is some evidence that Plaintiff began work by 5:30 in the morning and may have been off duty during the times of the specified logins. *See* Robinson Dep., pp. 155, 158, 215, 217.

Although T-Mobile argues that it terminated Plaintiff for dishonesty and for violating its company policy relating to integrity, the court concludes that there is a genuine issue of material fact regarding whether T-Mobile terminated Plaintiff to interfere with her additional rights under the FMLA. Plaintiff's version of the events indicates that Mr. Bechard had discouraged her from maximizing her FMLA leave, had told her that her leave was "killing him," and had told her that she must choose between her personal life and her professional life. Robinson Dep., pp. 155-58, 146-47, 206-07. The evidence indicates that Mr. Bechard initiated all discussions regarding Plaintiff's termination with higher management, and there is no indication in the record that Mr. Jones or Mr. Krug would have terminated Plaintiff without Mr. Bechard's initiation of the process. In addition, Plaintiff asserts that Mr. Bechard promised Plaintiff that he would help her

with her work during her mother's illness, but held her lack of evidence of coachings against her during the period she had been on FMLA leave. Further, the evidence suggests that Plaintiff had not been fully trained regarding what her coaching responsibilities were. *See* Robinson Dep., pp. 127-29.

While it is possible that T-Mobile terminated Plaintiff solely because of her alleged dishonesty, there is a genuine issue of material fact regarding T-Mobile's motivation for termination, especially considering that Mr. Bechard was the driving force behind the termination. Mr. Bechard questioned Plaintiff's coachings and took Plaintiff's badge from her on February 25th, one day after her return from leave and one day after Plaintiff asserted her right to additional leave. He immediately commenced the process of ensuring her termination on that day, and by February 27th T-Mobile had terminated Plaintiff. There is evidence that Plaintiff was a valued worker, including her receipt of the Peak Award in 2007. T-Mobile does not dispute that Plaintiff won this award or that she had satisfactory evaluations for 2007 and the last quarter of 2007.

Although there is some evidence that Plaintiff was not fulfilling her coaching responsibilities, it is a question for the jury whether T-Mobile was solely motivated by Plaintiff's performance in terminating her rather than by her intended use of additional FMLA leave. There is a genuine issue of material fact surrounding whether Plaintiff's assertion of her FMLA rights was a negative factor in Mr. Bechard's decision to seek her termination. Based on the timing of the termination, as well as additional extrinsic evidence supporting Plaintiff's position that Mr. Bechard did not want to provide her with any additional FMLA leave, the court concludes that summary judgment is not warranted on this issue. For these reasons, T-Mobile's motion for

summary judgment on Plaintiff's FMLA interference claim will be **DENIED**.

      **2.**     **FMLA Retaliation Claim**

The FMLA also protects employees from retaliation or discrimination for exercising their rights under the FMLA. As the Sixth Circuit in *Arban* noted, "'an employer is prohibited from discriminating against employees . . . who have used FMLA leave,'" nor can they "'use the taking of FMLA leave as a negative factor in employment actions.'" 345 F.3d at 403 (quoting 29 C.F.R. § 825.220(c)). To demonstrate a claim under the "retaliation" or "discrimination" prong under § 2615(a)(2) a plaintiff must show that:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban*, 345 F.3d at 404); *see also Saroli v. Automation & Modular Components*, 405 F.3d 446, 451 (6th Cir. 2005). A plaintiff bears the burden of showing a causal connection and must demonstrate that the employer's reason for termination was pretextual and that the real reason for termination was the use of medical leave. *Killian*, 454 F.3d at 556. Another district court in this Circuit has outlined the way to analyze an FMLA discrimination claim that closely follows the method of analyzing other employment discrimination claims:

> There are three methods by which an FMLA plaintiff may establish a prima facie case of FMLA discrimination: by direct evidence of discriminatory intent; by circumstantial evidence of discriminatory intent through the use of the paradigm postulated in *McDonnell Douglas*; or by establishing a pattern of discrimination through the use of statistical evidence. Most FMLA discrimination cases have involved an attempt by the plaintiff to present a prima facie case using circumstantial evidence of discriminatory intent through the familiar three-part burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973). . . . Under *McDonnell Douglas*, the plaintiff has the initial burden of proving a prima facie case by a preponderance of the evidence. . . . [A plaintiff] must prove the following to make out a prima facie case: (1) he engaged in a protected activity; (2) [the defendant] took adverse employment action against him; and (3) there is a causal connection between his protected activity and the adverse employment action. . . .

"If the plaintiff successfully proves a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the employee's discharge.'" "Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence 'that the legitimate reasons offered by the [employer] were not its true reasons, but were merely a pretext for discrimination.'"

*Summerville v. ESCO Co. Ltd. Partnership*, 52 F.Supp.2d 804, 808-09 (W.D. Mich. 1999) (quoting *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991) (other citations omitted)). *See also, Skrjanc*, 272 F.3d at 315-16; *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

In addition, the proximity in time between a request for FMLA leave and an adverse action is a form of indirect evidence of discrimination. *Skrjanc*, 272 F.3d at 315. A plaintiff can meet the burden of demonstrating pretext by "producing evidence tending to show that [the defendant's] proffered reason for his discharge was false." *Id.* at 316. However, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Id.* at 317. Where temporal proximity is weighed with additional evidence, the totality of such evidence may state a claim of FMLA retaliation. *See e.g.*, *Arban*, 345 F.3d at 403.

The Sixth Circuit has also addressed the question of whether the FMLA prohibits an employer from discriminating against an employee for exercising the right to take FMLA leave:

Any "right" to take unpaid leave would be utterly meaningless if the statute's bar against discrimination failed to prohibit employers from considering an employee's FMLA leave as a negative factor in employment decisions.

-22-

Interpreting § 2615(a)(2)'s ban on discrimination in a manner that would permit employers to fire employees for exercising FMLA leave would undoubtedly run contrary to Congress's purpose in passing the FMLA. . . .

In light of the foregoing, we conclude that the FMLA itself prohibits employers from taking adverse employment actions against employees based on the employee's exercise of FMLA leave. We thus also conclude that the Department of Labor's interpretation of § 2615 in § 825.220 is a reasonable interpretation of the statute and a valid exercise of agency authority. . . . As we have explained, in light of the overwhelming consensus in the courts that the FMLA *does* prohibit such retaliation, we disagree that the plain text fails to afford employees protection from retaliation against the exercise of FMLA leave. Further, the structure and purpose of the Act, as well as its legislative history, support our interpretation that Congress intended the FMLA to prohibit employers from considering an employee's use of FMLA leave as a negative factor in employment decisions.

*Bryant v. Dollar General Corp.*, 538 F.3d 394, 401-02 (6th Cir. 2008) (citing 29 U.S.C. § 2615

and 29 C.F.R. § 825.220).

The Sixth Circuit also recently determined that "the FMLA, like Title VII, authorizes

claims in which an employer bases an employment decision on both permissible and

impermissible factors." *Hunter v. Valley View Local Schs.*, __ F.3d __, 2009 WL 2601863 (6th

Cir. Aug. 29, 2009) (relying on 29 C.F.R. § 825.220(c) which states that an employer "cannot

use the taking of FMLA leave as a negative factor in employment actions"). The Court further

instructed that:

> [i]n light of our reading of the FMLA through the lens provided by *Gross*, we continue to find *Price Waterhouse's* burden-shifting framework applicable to FMLA retaliation claims. Accordingly, if [plaintiff] has presented evidence to establish that [the defendant] discriminated against her because of her FMLA leave, then the burden shifts to [the defendant] to "prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."

*Id.* at *4 (citing *Gross v. FBL Fin. Servs., Inc.*, ___ U.S. ___, 129 S.Ct. 2343, 2348-49, 174

L.Ed.2d 119 (2009) and *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104

L.Ed.2d 268 (1989)) (other quotation omitted).

In this action, the court concludes that the Plaintiff has demonstrated that she was exercising her rights under the FMLA and that T-Mobile knew she was exercising her rights under the FMLA. The day Plaintiff returned from leave, February 24, 2008, she alleges that she requested additional FMLA leave from her manager, Mr. Bechard. The day after that request Mr. Bechard took her badge and began the process of seeking Plaintiff's termination from the company. By February 27, 2008, T-Mobile had terminated Plaintiff's employment. Thus, the court concludes that Plaintiff suffered an adverse action, namely her termination from employment. Next Plaintiff must establish a causal connection between her termination and her use of FMLA leave or her attempt to assert her rights under the FMLA.

The court concludes that there is a genuine issue of material fact regarding whether Plaintiff's past FMLA leave or future intent to take FMLA leave constituted a negative factor in the decision to terminate her. The evidence viewed in the light most favorable to the Plaintiff indicates that Mr. Bechard's tone towards Plaintiff changed completely during the conversation in which he realized she intended to request additional FMLA leave. Robinson Dep., p. 158. Moreover, he had made no request for written documentation of her coachings *prior* to learning that Plaintiff wished to take more FMLA leave. Thus, it is entirely plausible that Mr. Bechard manufactured the problem with Plaintiff's coachings to justify terminating her. This is a classic question of pretext, and it is a question whose resolution should be left to the jury. There is a genuine issue of material fact regarding whether Mr. Bechard would have sought Plaintiff's termination if she had not asserted her rights under the FMLA. For these reasons, the court will **DENY** T-Mobile's motion for summary judgment on Plaintiff's FMLA retaliation claim.

### B. Tennessee Disability Act Claim

Plaintiff alleges in her Complaint that "[t]he Defendant regarded the Plaintiff's mother as a person with a handicap. Defendant terminated the Plaintiff for a pretextual reason because the Defendant believed that this handicap caused Plaintiff to miss work." Complaint, ¶ 11. The THA prohibits "discrimination in the hiring, firing and other terms and conditions of employment . . . of any private employer, against any applicant for employment based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn. Code Ann. § 8-50-103(b). To demonstrate a claim under the THA, Tennessee courts require a plaintiff to show: "(1) that she was qualified for the position; (2) that she was disabled; and (3) that she suffered an adverse employment action *because* of that disability." *Oates v. Chattanooga Pub. Co.*, 205 S.W.3d 418, 424 (Tenn. Ct. App. 2006) (citing *Barnes v. The Goodyear Tire and Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. Sup. Ct. 2000)). Tennessee courts have also clarified that they "are neither bound by nor restricted by the federal law when interpreting [Tennessee's] anti-discrimination laws. The THA embodies the definitions and remedies provided by the Tennessee Human Rights Act ("THRA")." *Barnes*, 48 S.W.3d at 705 (citing *Forbes v. Wilson Cty. Emergency*, 966 S.W.2d 417, 420 (Tenn. Sup. Ct. 1998)). Although under the THRA a "handicap" is defined as "being regarded as" having a "physical or mental impairment which substantially limits one (1) or more of such person's major life activities," *see Barnes*, 48 S.W.3d at 706 (citing Tenn. Code Ann. § 4-21-102(9)(A)), there is nothing in the THA which provides protection for discrimination based on the perception of disability of a close family member. The law clearly states that it

-25-

protects against discrimination based on the disability *of the applicant*. *See* Tenn. Code Ann. § 8-50-103(b). Plaintiff does not provide any caselaw in support of her contention that she states a claim under the THA for discrimination based on the alleged discrimination against her because of the perceived disability of her *mother*. As this court has found no support for a claim of such alleged discrimination under the THA, the court will **GRANT** T-Mobile's motion for summary judgment on Plaintiff's THA discrimination claim.

### IV. Conclusion

For the reasons stated *supra*, Defendant's motion for summary judgment will be **DENIED** in part and **GRANTED** in part. The court further concludes that Plaintiff's motion to strike will be **DENIED**.

A separate order will enter.


_____*/s/ R. Allan Edgar*_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE